HEARD NOVEMBER TERM, 1874.

## BILLINGS *vs.* CLINTON.

Conclusions of a Referee upon questions of fact, concurred in by the Circuit Court, reversed.

A resulting trust arising from the alleged use of another's money in the purchase of lands will not be established upon parol evidence unless the proof is clear and convincing. Doubtful evidence is not sufficient.

Not only must the payment be shown, but where it is not the whole consideration, then some definite part, as one-half, one-third or the like, must be shown to have been the money of the party alleging the trust.

The evidence reviewed by the Court and: *Held* not to sustain the claim of a resulting trust.

A claim to a resulting trust: *Held* to be barred by the laches of the claimant.

BEFORE MACKEY, J., AT LANCASTER, JULY TERM, 1874.

The brief upon which the appeal was heard fully states the case, and is as follows:

Minor Clinton, Esq., who was the executor of the last will of Abram Perry, deceased, died in 1865 testate. Irvin Clinton and K. G. Billings were named as executors in the will of M. Clinton, but the former declined to qualify. The will, without giving any description of the real estate, after first reserving a house and lot which he had previously given to Mrs. Mayer and her son, disposed of his property as follows, to wit: "I give, devise and bequeath to my brother, Irvin Clinton, and my friend, Kennedy G. Billings, to be equally divided between them, all the rest, remainder and residue of my entire estate, consisting of about sixty-three negroes, my law office and lot, stock of all kind, choses in action and every other species of property I may own or possess at my death, share and share alike, under this clause and bequest. My entire estate will pass and descend to the said Irvin Clinton and Kennedy G. Billings, except the house and lot given to Mrs. Mayer and son."

The will neither shows what real estate he owned ·nor what interest he had therein, and it bears date the 15th November, 1864. Shortly afterwards, K. G. Billings, who was named executor in the will, was duly qualified as such and regularly assumed the administration of the estate. On the      day of      , 1867, he filed a bill in the Equity Court for Lancaster alleging the insolvency of the testator's estate, seeking an injunction against suing and other creditors, and requiring them to come in and establish their claims against the estate, and praying a sale of the realty to aid in the payment of the debts.

At the hearing, June 27, 1867, (an order *pro confesso* of the same date having been taken against the defendants,) Chancellor Carroll ordered that the creditors be enjoined; that Benjamin R. Clyburn be appointed Special Referee; that the creditors be called on to establish their claims before him; that the executor account before said Referee; that the complainant and the defendants named as creditors have leave to apply at Chambers for a sale of the real estate; that the defendant, Irvin Clinton, have leave until the first day of the next January to file his answer to the bill, and that the Referee in his report on the accounts of the executor distinguish between the claims belonging to the estate of the testator and those which may appear to belong to the estate of Abram Perry, deceased. Irvin Clinton being a devisee under the will of M. Clinton was made a party defendant to this bill.

Shortly afterwards, under an order obtained at Chambers, the real estate was sold by the Commissioner in Equity, who reported the same to the Court at the June sitting in 1868 as follows:

" The Commissioner reports that, in obedience to the decretal order of this Court made at Chambers, 1867, he exposed to sale at public auction at Lancaster Court House, on Monday, the 7th day of October, 1867, after having advertised for twenty-one days in the Lancaster Ledger, the tracts of land described in the pleadings as belonging to the estate of Minor Clinton, deceased.

" The Bear Creek place, containing five hundred acres, more or less, was bought by W. J. White for the sum of $2,500, he being the highest and last bidder therefor. The Commissioner executed to the said Will J. White a deed of conveyance for the same, he having complied with the terms of sale by giving his bond for the sum of $2,414.45, with Martin P. C. White as security, together with a mortgage of the premises.

" The Flat Creek land, containing seven hundred acres, more or less, was bought by John A. Bird for the sum of $1,700. Commissioner executed a deed of conveyance to .the said John A. Bird, he having complied with the terms of sale by giving his bond for the sum of $1,641.80, with Charles Bird and Amos Cook as securities, with a mortgage upon the premises.

" The Dry Creek place, containing one hundred acres, more or less, was bought by Albert Clinton for the sum of $190, he being the highest and last bidder therefor. The Commissioner executed

to him a deed of conveyance for the same, he having complied with the terms of sale by giving his bond for $183, with Isom Clinton and Irvin Clinton as securities, with a mortgage upon the same.

"The Wild Cat place, containing two hundred and sixty-eight acres, more or less, (the interest of deceased being one-half thereof, which interest was sold,) was bought by B. J. Witherspoon for the sum of $90. The Commissioner executed to him a deed of conveyance for the same, he having complied with the terms of sale by giving his bond for the sum of $86.92, with J. H. Witherspoon as security, together with a mortgage upon the premises.

"The lot in the village, known as the law office, was bought by John Brown, who, having complied with the terms of sale by giving his bond, with D. W. Brown as security, for $714.68, together with a mortgage, the Commissioner executed to him a deed of conveyance.'

"Lot No. 3, being fourteen feet in front, was bought by A. Mayer for the sum of $24.18, which he paid in cash. The Commissioner executed a deed of conveyance to the said A. Mayer."

An order of the Court confirming this report was made June 22, 1868.

On the 31st day of December, 1867, the defendant, Irvin Clinton, pursuant to the leave granted by Chancellor Carroll, in his order of June 27th, 1867, put on file an answer to the bill, which contains the following statements:

"Respondent, in further answering, is unwilling to admit the broad allegations of the bill, that testator, at his death, was seized and possessed in his own right of the tracts and parcels of land described in the bill of complaint, but denies that he was so seized and possessed of that portion of the tract known and described as the Flat Creek plantation. This Flat Creek plantation, as described in the bill, containing seven hundred acres, more or less, is composed of some three tracts, one of which, bounded, &c., and containing about      acres, was purchased by Minor Clinton and this respondent, jointly, from John Belk and Robert Belk, about the year 1850. Defendant does not know anything of the title deed to this tract so purchased from John and Robert Belk, and cannot now tell whether a deed for the same ever, in point of fact, was made or executed by John Belk and Robert Belk; but respondent certainly knows the fact that the purchase of this tract was made

jointly, by Minor Clinton and himself, with common funds arising from the proceeds of the copartnership in the practice of law that existed between the said Minor Clinton and this respondent for a number of years. Respondent avers that the testator and he, both, soon after the purchase aforesaid, took possession of the said tract of land with a full knowledge and understanding that it was their joint property, and to be used and enjoyed between them as such. And defendant does not know that his brother, Minor Clinton, ever, in his lifetime, disputed the right and claim of this respondent to the same, and believes that if his brother were now living and could speak, he would verify the statement herein made and concede to this respondent his just rights in the premises.

" As to the balance of the Flat Creek plantation, respondent does not know how it was purchased, in whose right it was purchased, or with what funds.

" Respondent, in further answering as to Bear Creek plantation, situate near Lancasterville, cannot say whether it was held by the testator in his sole right or not. Respondent, of his own knowledge, does not know whether testator paid for this tract out of his own funds, or out of the copartnership funds, and cannot tell in whose name the title deeds were taken,—whether, in point of fact, any titles to the same ever were taken. Respondent has been informed that the titles to none of the tracts described in complainant's bill are on record in the office of the Register of Mesne Conveyance for the District."

On the 28th of September, 1868, the respondent, Irvin Clinton, pursuant to leave granted by order of the Equity Court, put on file an amended answer, which contains statements as follows:

" He avers that the Bear Creek tract of land, described in the bill of complaint, which was sold under the prayer of the same by order of the Court, was purchased and acquired by funds belonging to the law copartnership aforesaid between Minor and Irvin Clinton, and has been held in common ever since by Minor Clinton and this respondent. Respondent does not know in whose name the title deed was taken; whether in the name of Minor Clinton or Irvin Clinton, or in the name of both, this respondent cannot now tell. Respondent, at the time of the filing of the original answer, believed that he had a joint interest in the land or plantation, and desisted from making the positive averment of his right and claim in this behalf at that time solely for the reason that, although he felt satis-

fied in his own mind of his said right, title and claim, was unwilling to make the positive averment and lay the claim without some other extrinsic and tangible evidence than existed in his own bosom and feelings.

"Respondent, in further answering, shows to your Honors that since the filing of his original answer he has found a written agreement, duly signed and executed, partly in the handwriting of Minor Clinton himself, for the employment of a superintendent and manager for the said Bear Creek tract of land. Exhibit A, herewith filed, is a copy of the same, which said agreement affords evidence that the said tract of land was the joint property of Minor Clinton and this respondent, and he thinks that he will be able to produce other evidence of the joint ownership. And this respondent, in addition to the claim set up in his original answer, now claims and asserts his right to the one-half interest in the proceeds of the sale of said Bear Creek tract of land as sold by the Commissioner of this Court, and also to the one-half portion of the rents, issues and profits of the same from the time of the purchase of the same from Abram Perry in the year 1831 up to the date of the sale by the Commissioner."

An order of reference was then made, referring it to the Referee to inquire and report upon the subject matter of this answer as amended.

And at the reference held by the Referee, the plaintiff, K. G. Billings, interposed no objections whatever to the claim as set up by Irvin Clinton; but the appellants, who were not parties to the record, but who came in as creditors and defendants, after the published notice through their attorney, interposed objections by cross-examining Irvin Clinton's witnesses. These appellants being defendants without filing answers, did not undertake to file any cross bill or in any other manner allege any objections to Irvin Clinton's claim until they did so orally on the hearing of the Referee's report. And the said Irvin Clinton was in no way advertised of their objections until said hearing.

On the reference held on the claims set forth in the above mentioned answer and amendment, eleven witnesses, including the claimant himself, six of them being persons of color, formerly the slaves of one or the other of the Clintons, were examined on the part of the said Clinton. And the appellants examined no witnesses and did not offer any testimony.

From the testimony of the respondent himself were elicited the following facts:

Minor Clinton became located at Lancaster Court House in the practice of law in the year 1819. The respondent, Irvin Clinton, entered the office, by the persuasion of his brother, as a law student and clerk, in the year 1823, and continued in this capacity to the year 1830, when he was licensed and then entered into copartnership with his said brother. From 1823 to 1830, the time of the forming of the partnership in law, the said Irvin Clinton acted continually in the office of his brother, doing all kinds of office work, such as issuing writs and processes and filing declarations, &c., in which business he was as expert before he was licensed as he was afterwards. The copartnership between the brothers continued up to 1845 or 1846, their earnings averaging from $800 to $1,000 per annum. Minor Clinton received almost all the moneys due the law copartnership and never accounted to the witness for the same.

The Abram Perry portion of the Bear Creek place was bought in 1831, bought from the said Abram Perry, who had for a number of years been a client of Minor Clinton's. This tract was cultivated by M. & I. Clinton jointly up to 1846, and ever after by the said Minor Clinton alone until his death in 1865. And since 1846, Minor Clinton appropriated to himself the profits thereof without accounting to Irvin Clinton.

Irvin Clinton did not receive more than $700 in cash from the law copartnership, and nothing else unless it be the consideration of partnership lands as claimed by witness. He has never seen the title deeds to any of the lands claimed by him as partnership property; has searched for such papers; never saw any deeds executed to M. & I. Clinton, or to either of them, for the lands referred to in his answer. Has no knowledge that any such deeds were ever executed. He says the Bear Creek place and the Belk lands, on Flat Creek, are the lands which he claims to have been purchased by M. & I. Clinton as partnership property; also the Black Otter or Cedar Creek place; both M. and I. Clinton were present when the Black Otter place was purchased. [Here certain declarations of M. Clinton were proposed to be proved by this witness, (I. Clinton,) but appellant's counsel objected to the testimony as inadmissible, and the Referee sustained his objections.] Witness resided on the Bear Creek place for several years after it was purchased, cleared land, built houses thereon, and worked the

same and acted and felt that he was a joint owner therein. M. Clinton never denied by any act or word to witness the joint interest of witness in the Bear Creek place, the Belk and Black Otter places, but M. Clinton, after witness had left the Bear Creek place, took possession of the same and appropriated the profits to his own use. Witness left the place on account of sickness and not on account of any unpleasantness with his brother. Witness could have remained there as long as he pleased. Witness says M. Clinton had a conference with witness before the purchase of the Belk lands.

Witness says the Belk lands were bought before 1850 or 1851. Irvin Clinton had a view of settling there, but after working a few months clearing lands and building houses he left in 1850 or 1852, and M. Clinton took possession and worked the lands until his death. These lands were bought of John and Robert Belk, who had been the clients of M. &. I. Clinton in a big lawsuit between the years 1845 and 1850, I. Clinton having continued after 1845 or 1846, the time he left the Bear Creek place, to attend the Courts and assist in the cases then pending.

Witness had nothing to do with the negotiations for the purchase of the Bear Creek and Belk lands; paid no money out of his own pocket; says they were paid for, as above indicated, by M. Clinton; was not present when deeds were executed, if any ever were executed. Witness at one time did say to M. Clinton that he would like to have a settlement of their partnership matters. Witness says that all the definite information he has in reference to the Bear Creek and Belk lands having been purchased as copartnership property of M. & I. Clinton was from the declarations of M. Clinton, and all his knowledge that these lands had been bought with partnership funds, in whole or in part, is derived from same source, except where otherwise shown above.

It was admitted that after diligent search for the deeds relating to these lands, no deeds could be found,—no deeds to any person,—and that no records of any such deeds can be found in the Clerk's or Mesne Conveyance office for Lancaster County; and that no record of any deeds to M. Clinton for any land are to be found in said office.

Other witnesses testified to various declarations of M. Clinton made at different times from 1846 up to his death, in which he acknowledged that Irvin Clinton had an interest as partner or joint owner not only in the Bear Creek or Perry and in the Belk lands, but also in the other lands held by the deceased.

The report contains the following findings of fact, conclusions and recommendations:

"The claim of Irvin Clinton is presented, since my last report, in the answer and amendment thereto of Irvin Clinton. The plaintiff in this case, as executor of Minor Clinton, deceased, filed his bill to marshal the assets of the estate of Minor Clinton, and for a sale of the real estate of said deceased. The answer of this defendant, Irvin Clinton, seeks to establish the fact that the defendant, I. Clinton, was a joint tenant and owner with Minor Clinton in his lifetime in respect to the lands situate on Flat Creek, purchased from John and Robert Belk, and also in so much of the lands situate on Bear Creek, near the village of Lancaster, as were purchased from Abram Perry, from the time the lands were purchased up to the death of the said Minor Clinton, and also that he was a joint owner in a tract of land on Dry Creek alleged to have been sold by Minor Clinton to one W. B. Cauthen. And the defendant, I. Clinton, further claimed rents and profits of the estate of Minor Clinton, because of the same having been almost exclusively appropriated by Minor Clinton so far as the lands referred to are concerned. He also claimed that a very large amount of money would be due him from the estate of Minor Clinton, in a fair accounting, on account of the law partnership which existed for so many years between him and his said brother. This claim, as thus made, appears not to be denied by any pleading in the case; in fact, the plaintiff, who is in general the representative of all creditors, legatees and devisees, has offered no resistance to the said claim, but appears to treat with becoming respect the claim made by the brother of his testator. The claim, however, has been indirectly resisted by William A. Moore, Esq., as attorney for certain heirs of one A. Perry, deceased, but, being so resisted, without an opportunity of stating in the form of pleadings his objections to said claim, it has been with some difficulty that the Referee has been able to see the full force of such objections."

The Referee finds in the testimony the following state of facts:

"1. That I. Clinton entered the law office of his brother Minor as a student and clerk in the Fall of 1823, his brother Minor having opened in Lancaster in 1819; that he continued in this relation

with his brother up to 1830, when the two entered regularly into copartnership, which ended about 1845 or 1846.

" 2. That the copartnership was profitable, and that M. Clinton received and appropriated almost all the profits of the law firm.

" 3. That there never was any accounting by Minor and settlement with his brother on account of law partnership, and that Minor Clinton has often acknowledged to witnesses that he owed Irvin Clinton.

" 4. That they bought, jointly, the Perry lands, on Bear Creek, worked them jointly for some twelve or fifteen years, each exercising a full joint ownership over the same; and that Minor, up to a few months before his death, accorded to Irvin a joint interest in these lands, and that he, according to the proof, at no time was heard to deny the interest of his brother; but it does not appear in whom vested the legal title, in one or the other, or in both.

" 5. That the same state of facts appear with reference to the Belk lands, on Flat Creek, and the lands on Dry Creek, sold by Minor Clinton to W. B. Cauthen, except that Minor sold the latter, in probably 1864, to W. B. Cauthen, and received the money for the same.

" 6. That from the declarations of Minor Clinton, as proved by a number of witnesses, he, although being in actual occupancy of these lands for a number of years, never claimed them exclusively as his own, but appeared to recognize at all times the joint interest of his brother. I therefore conclude that Irvin Clinton was a joint owner with his brother, Minor Clinton, in these tracts or portions of land above described, to wit: The Perry lands, on Bear Creek, the Belk lands, on Flat Creek, and the lands on Dry Creek, as sold to W. B. Cauthen, and that he is now either entitled to the one-half part in the lands themselves or to the one-half part of the sales of said lands by order of this Court in this case, where the lands have passed out of the control of the plaintiff, as executor aforesaid. And in case any of the lands be still in the possession or control of the plaintiff, as executor aforesaid, then the Referee considers that said land should stand pledged for the payment of any sum that may be ascertained to be due Irvin Clinton on account of the same. And the Referee considers that no order should be made for the disbursement to the creditors of moneys belonging to the estate of Minor Clinton until the claim of Irvin Clinton shall be first ascertained to its full extent. And to this end the Referee would recommend that it be referred to Special Referee to inquire and report:

" 1. How much land is included in the Perry tract, on Bear Creek, the value thereof .on the day of alleged sales as compared to the Caston lands belonging to same body, and in whom vests the title at this time, and whether the sale by the Commissioner has been realized.

" 2. The amount and value of the Belk lands, on Flat Creek, as compared with the other lands in the same body on the day of sale.

" 3. The value of the lands on Dry Creek, sold by Minor Clinton to W. B. Cauthen, and what sum, if any, is due Irvin Clinton from the estate of Minor Clinton on account of these lands.

" 4. The sum or sums on account of the rents and profits of all these lands in the lifetime of Minor Clinton, as well .as since his death, is or are now due Irvin Clinton, and should be paid to him by the plaintiff as executor.

" 5. What amount of money, if any, is now due Irvin Clinton from plaintiff as executor of Minor Clinton on account of their un-settled law copartnership.    And that said Referee report any special matter with the testimony taken."

To this report the appellants excepted orally at the hearing:

1. That the conclusion of the Referee that the respondent was jointly entitled to the lands described, as tenant in common with Minor Clinton, in the lifetime of the latter, was wholly unauthorized by the facts proven.

2. That the claim of respondent is a stale claim.

3. That inasmuch as only the interest and title of Minor Clinton, deceased, in the land was sold and conveyed by the Commissioner, the respondent could in no point of view lay claim to any portion of the proceeds of the sales.

4. That if the estate of Minor Clinton, deceased, is indebted to respondent for rents of land and any balance on their copartnership accounts, the same should have been presented and established as a simple contract debt.

The decree of His Honor the presiding Judge is as follows:

MACKEY, J.   On hearing the report of the Referee, B. R. Cly-burn, filed July 10, 1874, in relation to the claim set up in the answer of Irvin Clinton, and the oral exceptions thereto, and the argument of counsel, it is ordered, adjudged and decreed that

said report, with its recommendations relating to the said claim of Irvin Clinton, except as to the tract of land referred to in said report as having been sold by M. Clinton, in his lifetime, to W. B. Cauthen, be confirmed and become the judgment of this Court.

It is further adjudged and decreed that the.lands referred to in said report as the Perry lands, on Bear Creek, and the Belk lands, on Flat Creek, at the time of the death of Minor Clinton, were held by the said deceased and Irvin Clinton as tenants in common, and that the defendant, Irvin Clinton, is now entitled to receive the one-half of the proceeds of the sales of said lands, with interest thereon from the date of the sale of the same by the late Commissioner in Equity for Lancaster.

It is further ordered that it be referred back to the same Referee to inquire and report how much land is included in the said Perry tract, on Bear Creek; the value thereof on day of sale by the Commissioner in Equity as compared with the Caston lands belonging to the same body, and whether the legal title to the same, at this time, is in the plaintiff to this action, and whether the proceeds of the sale by the Commissioner in Equity has been realized.

And said Referee do inquire and report the value of the Belk lands, on Flat Creek, on the day of sale as compared with the other lands in the same body which were so sold by the said Commissioner. And that he report the value of the tract sold by M. Clinton, in his lifetime, to W. B. Cauthen, at the time of such sale, and what may be now due Irvin Clinton from the estate of Minor Clinton on account of the sale of this tract of land.

And it is further ordered that said Referee do inquire and report what sums of money are now due Irvin Clinton from the estate of Minor Clinton on account of the rents and profits of the Perry and Belk lands above described, and also on account of the law copartnership which existed between M. and I. Clinton; and, further, that he inquire and report what rents and profits may be due I. Clinton from plaintiff as executor of M. Clinton, arising since the death of M. Clinton. Testimony also to be reported to this Court.

The appellants, creditors of M. Clinton, deceased, appeal on the following grounds:

1. Because His Honor erred in confirming and not overruling the report of the Referee in so far as the same relates to the claim of Irvin Clinton, the respondent.

2. Because the respondent utterly failed to establish by competent evidence that he had ever acquired title to any interest in the Perry, the Belk, or even in the land sold by M. Clinton to W. B. Cauthen.

3. Because, even if the respondent had shown by evidence legally sufficient that he had been entitled as tenant in common with Minor Clinton in the Perry and the Belk lands, inasmuch as only the interest and title of the said Minor Clinton was or could have been sold and conveyed by the Commissioner, the respondent could lay no claim to any portion of the proceeds of the sale.

4. Because the claim of respondent is a stale claim, and as such should have been rejected.

5. Because His Honor erred in directing an accounting for what rents and profits may be due I. Clinton from plaintiff as executor of M. Clinton arising since the death of M. Clinton.

*Moore,* for appellants.

*Allison,* contra.

March 22, 1875. The opinion of the Court was delivered by

Moses, C. J. The case presents some peculiar features. One not the least remarkable is, that while the respondent claims an undivided half interest in the separate tracts of land alleged in the lifetime of his brother, Minor Clinton, to have been held between them as tenants in common, no proof by a deed or other instrument was produced to show from whom the legal title was derived or in whom it actually vested. The lands were bought at different times from different persons;—not a deed is produced, and it is conceded that there is none on record. It is not only a singular instance of neglect on the part of the deceased, Minor Clinton, but a more extraordinary one on the part of Irvin, who from 1831, when the first purchase of the land in question was made, to June, 1867, when he filed his answer, by no act or declaration, in the absence of all paper title, did he prefer a claim to any portion of it devised by the will of the said Minor, of which he was appointed executor, and under which one-half of the whole estate was conveyed to him in fee; and this notwithstanding that an order for the sale of all the lands was made by a bill filed by the qualified executor, to which he was a party, and the order actually executed.

While the legal title of Minor Clinton to one-half of the two parcels of land is not disputed, Irvin claims that one-half of the consideration money paid by Minor was derived from a fund in which he held some interest not definitely stated, and rests his claim on no other right. He can then only sustain it as a trust of the legal estate in an undivided interest in the land resulting to him from the application of his money by the said Minor Clinton to the purchase. A trust so arising may be established by parol, for it is not within the Statute of Frauds, being expressly excepted from its operation.

Although parol proof is admitted to establish a trust thus resulting, nevertheless, to divest one of a legal title and confer it on another, it will not avail, unless it is *clearly* sufficient for the proposed end. Testimony which, while it may induce doubt, does not satisfy the mind of the actual existence of the facts necessary to establish such a trust will not be enough. The payment of the purchase money, on which the claim depends, must not be made out by conjecture, but by circumstances which show the fact. If they are loose and equivocal, they will not suffice.—See Lewin on Trusts and Trustees, 206; Hill on Trustees, 94; 3 Sugd. on V. and P., 174.

While the fact of payment must be established, it must " be of some definite part of the whole consideration, as one-half, one-third or the like."—*Sayre* vs. *Townsend,* 15 Wend., 651; *White* vs. *Carpenter,* 2 Paige, 238, 241. In the case before us, so far from any proof of a definite portion of the consideration paid by Minor having been of the money of Irvin, it is a claim through an unsettled copartnership, which for a time existed between them, no account having been taken, and their relation to the fund not yet ascertained. It assumes that Minor was indebted to Irvin for one-half of the earnings of a law copartnership for about fifteen years, yielding from $800 to $1,000 per annum, of which, in the language of the respondent, in his evidence, "Minor received all the moneys due." It is, therefore, clear that if he was entitled to an interest in any portion of the lands, even if bought with the proceeds of the partnership, the extent must depend on the portion of his money thus derived and appropriated, and this to be ascertained on an account between them which was never taken. Now, it is true that in the absence of proof of the interest which a partner is to have in the earnings of the firm, he will be entitled to an equal

share of the profits.   Here, assuming an indebtedness by Minor to Irvin, the amount of it is not established.   How, then, even supposing that the purchase was made with copartnership funds, is the interest of Irvin in the lands so purchased ascertained to be one-half?   The Bear Creek plantation, for instance, was bought in 1831, when they had only been in copartnership for one year; how much of Irvin's interest in its earnings was applied by his brother to the purchase?

A brief review of the facts of the case, looking to the time when this claim was first presented, cannot fail to make impressions not at all consistent with its support.   Minor Clinton died in 1865, leaving a will executed in November, 1864, by which he disposed of all his property, including sixty-three slaves, in equal proportions, between his brother Irvin and R. G. Billings.   They were nominated his executors, but the latter alone qualified.   In 1867, Billings filed a bill alleging the insolvency of the testator,—seeking to enjoin creditors, and praying a sale of the realty in aid of the payment of debts.   At June Term of the same year a Referee was appointed, creditors enjoined and called in, and shortly afterwards, under an order therefor, a sale of the real estate was made on 7th October, 1867.   Irvin Clinton had been made a party to the bill before the order of sale.   A report of sales was submitted to the Court at June Term, 1868, and confirmed.   On 31st December, 1867, he filed his answer, in which he claimed that the Flat Creek plantation (which was bought in 1850) was purchased by his deceased brother and himself from the Belks, with the proceeds of their law copartnership; but as to the Bear Creek place, he did not know whether the testator paid for it out of means derived from the same source or how it was held.   On 28th September, 1868, he amended his answer, alleging that from extrinsic evidence which he had obtained he believed he had an equal interest with his brother in the said tract, derived through the "funds belonging to the law copartnership."   No testimony of any kind was produced before the Referee, (save a contract with a superintendent for the Bear Creek place, year not given,) but the declarations of the deceased at various times and to various persons, from 1841 to 1865 inclusive, not only as to the joint interest of Irvin in the Bear Creek and Flat Creek plantations, but in all the lands he owned, together with his negroes, and, in fact, "all the property he had," as was said by one or more of the witnesses.   And yet Minor to

his death was in the use and possession of all the property,—notoriously dealing with and treating it exclusively as his own, even through the solemn act of a last will and testament.

There was no testimony as to the circumstances of Irvin,—why he so long rested without asserting his right to a settlement of the corpartnership, which expired as long ago as 1845 or 1846, Minor in the possession of property sufficiently large to respond,—and in fact there was no claim ever made until his whole estate was disposed of by a judicial sale in a cause to which the respondent was a party, and that sale confirmed without objection. Standing by and allowing these two parcels of land, in which he claims so large an interest, to be sold without a word of interposition, and then contesting the proceeds with the creditors, who had trusted the deceased, most likely, on the faith of the very property.

He says, in his examination, "that he had nothing to do with the negotiations for the purchase of the Bear Creek and Belk lands;" but in his answer he states "that the purchase of the Belk tract was made jointly by Minor and himself with common funds arising from the proceeds of the copartnership in the practice of law that existed between them for a number of years;" and, further, "that they soon after took possession of the said tract of land with a full knowledge and understanding that it was their joint property, and to be used and enjoyed between them," and yet no claim in the lifetime of Minor was ever asserted, although he alone retained the possession and use, and none was made after his death until the lands were sold, and then an interest in the proceeds of the sale was set up by reason of his alleged interest in the money with which they were bought.

The contract with the superintendent of the Bear Creek place made by the two brothers, while it may be a circumstance to show that they planted together, cannot be regarded as an admission by Minor of any interest in the land on the part of Irvin. Their joint planting ceased in 1845 or 1846, and the place was exclusively used by Minor to the time of his death without any claim of rent by Irvin.

The alleged declarations of Minor, in the manner they were made, in the face of the facts of the case, do not amount to an avowal or admission of a trust in any portion of his property in favor of his brother. If they amounted to that kind of acknowledgment which could bind him as a trustee, it would cover and include the whole

of the property which he had in possession at his death; for, looking to the testimony of all the witnesses, the alleged declarations would leave nothing in the possession of Minor at his death to be claimed through his individual right.

We do not regard the conclusion of the Referee on the facts as legitimately resulting from the testimony. On the contrary, in our judgment, the evidence leads to a different result. It may not be out of place to refer to the fact that although the Referee finds that the real estate was purchased by the copartnership funds and the said Irvin entitled therein to a one-half interest, he commends a reference to ascertain what amount is now due on such account, although Irvin in his answer preferred no such claim.

It might strike a practical mind as not unworthy of inquiry, if the earnings of the law practice of the firm amounted only to $800 or $1,000 per annum, after the support of both the partners, how much, on the most economical calculation, could have been left for the purchase of the lands in question?

Conceding to the witnesses who testify to the declarations of Minor the fullest credibility, testimony of that character is not favored by the Courts. Mr. Sugden, in his work on Vendors and Purchasers, p. 178, says: "When the evidence is merely parol, it will be received with great caution. Evidence of naked declarations made by the purchaser himself is, as Sir William Grant observed, in all cases most unsatisfactory evidence, on account of the facility with which it may be fabricated and the impossibility of contradicting it. Besides, the slightest mistake or failure of recollection may totally alter the effect of the declaration."

But if Irvin had the interest in the lands for which he now contends, he has lost it by his laches. Even where the Statutes of Limitation can be interposed, "it is the knowledge of the fact relied on which prevents the bar, not the discovery of evidence to establish it."—*Parham* vs. *McCrary*, 6 Rich. Eq., 140. It was at one time doubted whether a resulting trust was exempted from the operation of the statutes. It is not necessary here to consider the effect of time on such a trust through the statutes. The analogy of the statutes have, however, been applied to such trusts by the Courts, "and relief has been refused where the party with full knowledge, or being in a situation to have full knowledge, of his rights has delayed for twenty years to prosecute his claim. On more than one occasion "a delay of eighteen years in enforcing a claim founded

on a constructive trust has been held a sufficient reason for dismissing the bill."—Hill on Trustees, 265.

Mr. Lewin, in his work on Trusts and Trustees, p. 207, says: "The real purchaser may be also barred of his interest by laches, for the presumption of a resulting trust will not be raised after a great length of time in opposition to the evidence from actual enjoyment."

We think the principle so announced must prevail here.

The order of the Circuit Court of July 10, 1874, as far as it sustains the said claim, must be set aside, and it is so ordered.

*Wright,* A. J., and *Willard,* A. J., concurred.